**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **J.P. MORGAN SECURITIES LLC,** | ) | |
| | ) | **CIVIL ACTION NO. 1:19-cv-4163** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ERIK W. WEISS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**COMPLAINT**
**(INJUNCTIVE RELIEF SOUGHT)**

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendant Erik W. Weiss ("Weiss" or "Defendant"):

**Preliminary Statement**

1.     This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that concurrently is being filed with FINRA Dispute Resolution.[1]

2.     This dispute arises out of Defendant's departure from JPMorgan on September 13, 2019, and the immediate commencement of his employment with Raymond James & Associates, Inc. ("Raymond James").  At the time of his resignation, Defendant was a Private Client Advisor in one of JPMorgan's branch offices in Indianapolis, Indiana.

---

[1] The Financial Industry Regulatory Authority ("FINRA") was created in July 2007 through the consolidation of the National Association of Securities Dealers, Inc. and the member regulation, enforcement and arbitration functions of the New York Stock Exchange.  JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the FINRA Code of Arbitration Procedure for Industry Disputes.

3.     Since Defendant's resignation from JPMorgan and upon joining his new firm, Raymond James, JPMorgan has learned that Defendant is engaging in aggressive solicitation of JPMorgan clients, and disparaging JPMorgan in the process.

4.     Since Defendant has resigned from JPMorgan and joined Raymond James, JPMorgan employees have spoken with many of the clients that Defendant was assigned to service during his JPMorgan employment, several of whom have informed JPMorgan that Defendant has contacted and solicited them since his departure from JPMorgan. Such clients have confirmed that Defendant has contacted them not simply to announce his change in employment, but is actively soliciting their business on behalf of Raymond James.

5.     Specifically, JPMorgan has learned that Defendant is soliciting JPMorgan clients, primarily through phone calls and text messages to clients on their personal cell phones, in an effort to induce them to do business with him at Raymond James. At least three clients have informed JPMorgan that they received calls from Defendant in which Defendant asked to meet with them to discuss Raymond James or asked them to transfer their accounts to him at Raymond James. Moreover, one of those clients informed JPMorgan that he felt "pressured" by Defendant to meet with him and transfer his account to Defendant at Raymond James.

6.     In one instance, a JPMorgan client informed the firm that after the client declined Defendant's request that they meet to discuss doing business, Defendant asked the client to call him and report back to him everything JPMorgan had to say. At least one other client reported a similar experience, in which Defendant requested that the client call him to update him on what JPMorgan is telling the client. On information and belief, Defendant intended to use this information in his continued solicitation of JPMorgan clients.

7. In addition, to aid in his solicitation efforts, Defendant is making disparaging comments about JPMorgan to JPMorgan clients. A JPMorgan client informed the firm that during Defendant's solicitation call to the client, Defendant said that JPMorgan has inferior products to that of Raymond James and that JPMorgan management limits the products that can be can to offered to clients. On information and belief, Defendant is making such false and disparaging statements in an effort induce the JPMorgan clients to transfer their accounts and assets from JPMorgan to him at Raymond James.

8. In addition to improperly soliciting JPMorgan clients, on information and belief, Defendant improperly took with him to Raymond James JPMorgan's confidential client information, including contact information such as cell phone numbers, which, on information and belief, are generally not publicly available, and without which he would have been unable to immediately commence calling and soliciting JPMorgan clients upon his resignation.

9. Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as approximately 40 JPMorgan clients formerly serviced by Weiss have already transferred their accounts to him at Raymond James, with a total of more than $27 million in assets.

10. At the time he left JPMorgan, Weiss serviced approximately 600 JPMorgan clients/households, the substantial majority of which were either pre-existing JPMorgan clients at the time they were assigned to Weiss, or were developed by Weiss at JPMorgan. The clients whom JPMorgan had assigned to Weiss to service had a total of approximately $197 million in total assets under management. Weiss now seeks to improperly induce such JPMorgan clients to follow him to Raymond James.

11. Defendant's conduct constitutes a breach of his employment agreements (which contain non-solicitation provisions), JPMorgan's Code of Conduct (which he agreed to abide by), and a violation of his common-law obligations to JPMorgan.

12. To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring Defendant from using JPMorgan's confidential and proprietary business and client information, pending resolution of JPMorgan's claims against Defendant in a related arbitration that JPMorgan also is in the process of commencing.

## Jurisdiction and Venue

13. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that a substantial part of the events giving rise to the claims occurred in Indianapolis, Indiana.

## The Parties

15. Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York. The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York. JPMorgan is a member firm of FINRA. Defendant maintains securities licenses through FINRA.

16.     JPMorgan provides traditional banking, investment, and trust and estates services in the Indiana area through its Chase Wealth Management branch offices.  Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment and banking needs.

17.     Defendant is an individual who at all times relevant herein was employed and/or conducted business in Indianapolis, Indiana and is and was a citizen of Indiana.  Defendant also is a registered representative currently employed by Raymond James.  Defendant was previously employed by JPMorgan in its Indianapolis, Indiana branch office.

18.     In connection with his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration disputes, claims and controversies arising between himself and JPMorgan.

**Factual Allegations**

19.     Weiss commenced employment with JPMorgan or its predecessors in or about January 2007, when he joined Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer, and an affiliate of JPMorgan, and entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "2007 Non-Solicitation Agreement"), which contains provisions prohibiting him from soliciting the firm's clients for a one year period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information.  Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

20.     In 2013, Defendant was promoted to a Private Client Advisor and entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement with JPMorgan (the "2013 Non-Solicitation Agreement").   The 2013 Non-Solicitation Agreement also contains provisions prohibiting Defendant from soliciting JPMorgan clients for a period of one year after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information.

21.     At the time of his resignation, Weiss was a Private Client Advisor. JPMorgan Chase Bank, N.A. ("Chase Bank"), an affiliate of JPMorgan,[2] referred its bank clients to Defendant, in his capacity as a Private Client Advisor for Chase Wealth Management, in order for him to build JPMorgan's relationship with such clients.  Defendant sat at his desk at a Chase Bank branch and was introduced to hundreds of existing bank customers (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As a Private Client Advisor, Defendant was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.  The substantial majority of the clients Defendant serviced at JPMorgan were assigned or referred to him by JPMorgan.

22.     JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficultly, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients, and JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  JPMorgan clients typically remain with

---

[2] For convenience, JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC sometimes collectively are referred to herein as JPMorgan.

and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan. But for his employment with JPMorgan, Defendant would not have had any contact with the substantial majority of the clients the firm assigned or referred to him and whom he is now soliciting.

23. As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as Raymond James.

**Defendant's Employment Agreements and Obligations to JPMorgan**

24. As noted above, Defendant entered into multiple agreements with JPMorgan or its predecessors during his employment that contain non-solicitation and confidentiality provisions.

25. Section 7(a) of the 2013 Non-Solicitation Agreement, entitled "Confidential Information," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

26.     Section 7(b) of the 2013 Non-Solicitation Agreement provides, in relevant part, that, in addition to any description in the Code of Conduct, Confidential Information includes, but is not limited to:

> i.  *names, addresses and telephone numbers of customers and prospective customers;*
>
> ii.  *account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*
>
> iii.  *specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*
>
> \*       \*       \*
>
> vi. *all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*
>
> \*       \*       \*
>
> viii. *information concerning established business relationships;*
>
> ix. *"trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section*

27.     In Section 7(c) of the 2013 Non-Solicitation Agreement, Defendant again expressly acknowledges that JPMorgan's customer account information contains confidential financial information, names, addresses, customers' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

28.     In Sections 7(d) and 7(e) of the 2013 Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

29. In Section 8 of the 2013 Non-Solicitation Agreement, Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

    a. *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets. Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* **you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.**

    b. *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including without limitation the Chase Private Client and Chase Wealth Management Platforms. Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with CISC and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A. Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC. The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill, reputation, name recognition, Confidential Information, specialized training, mentoring and expenditures made by JPMC. This platform and relationship model developed by JPMC is special and unique to JPMC, providing you and JPMC with a unique opportunity to service and interact with clients and customers in ways not known or available to competitors.*

    c. *This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the*

> *JPMC, and any such customers are listed on Attachment A signed by your manager.*

30.     Although Defendant had some limited prior industry experience before joining JPMorgan or its predecessors, Defendant brought no clients with him to JPMorgan. In fact, the "Attachment A" to Defendant's 2013 Non-Solicitation Agreement is blank in the section for listing pre-existing relationships that he is bringing with him to JPMorgan, which is consistent with JPMorgan's understanding that Defendant brought no clients with him to JPMorgan.

31.     In Section 10(a) of the 2013 Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with counsel:

> i.   *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*

> ii.  *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*

> iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving compensation associated with non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement,*

*and you will not challenge the enforceability or terms of this Agreement.*

32.     In addition, in Section 10(b) of the 2013 Non-Solicitation Agreement, Defendant acknowledges that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

33.     Defendant's 2007 Non-Solicitation Agreement with JPMorgan contains similar provisions to those referenced above.

34.     Additionally, in Section 3(b) of the 2013 Non-Solicitation Agreement, Defendant agreed to adhere to JPMorgan's Code of Conduct, as amended from time to time.

35.     Defendant was provided with JPMorgan's Code of Conduct, which was made available to all employees, as it was updated from time to time. Section 3.6 of JPMorgan's Code of Conduct, entitled "Leaving JPMorgan Chase," provides, in relevant part:

> *As a condition of working for [JPMorgan], there are certain As a condition of working for [JPMorgan], there are certain responsibilities you will have as you leave our Company and as your employment with our Company ends, including:*
>
> - *Providing advance notice of resignation for many employees*
>
> - *Returning all Company assets in your possession*
>
> - *Maintaining the confidentiality of information, not only of [JPMorgan] but of those individuals and companies that do business with [JPMorgan]; this does not prevent you from reporting to the government or regulators, your attorney or a court under seal, concerns of conduct that you believe to be in violation of law, or retaliation for reporting a concern*
>
> - *Refraining from buying or selling securities while in possession of MNPI relating to those securities (insider trading)*

- *Assisting with any investigations, litigation and the protection of intellectual property related to your job.*

  *Certain senior employees have additional obligations for one year after they leave [JPMorgan] including prohibitions in soliciting and hiring JPMorgan Chase employees or soliciting certain customers. Some employees are subject to other post-employment restrictions. You have a responsibility to known and comply with the requirements that apply to you. Consult with your Human Resources Business Partner if you have any questions.*

36.     As set forth in Section 1.2 of JPMorgan's Code of Conduct, all JPMorgan employees are required to affirm, either in writing or electronically, that they have read and understood the Code and that they will comply with it. Section 1.2 provides, in relevant part:

  *Each of us has a responsibility to uphold the Code; in fact, compliance with the Code is a term and condition of employment with the Company. This means you must know the Code, you must do the right thing when it comes to your own conduct, and you must speak up about conduct by others that might violate our Code or Company policies . . .*

  *Prior to joining the Company, new hires are required to provide an affirmation that they have read and understand the Code, will comply with it and will report suspected violations as required by the Code. New hires must complete Code training shortly after they begin work. All employees are required to complete additional Code training and provide a new affirmation periodically, usually annually. Compliance with these requirements is a condition of employment.*

37.     Each year, Defendant annually affirmed electronically his agreement to comply with the Code of Conduct.

38.     JPMorgan's "Responsibilities of Former Employees" policy link further provides in Section 5.1, in relevant part:

  *When you leave JPMorgan Chase, you are not permitted to use any Company assets or access its systems. You may only access its buildings in visitor status. You must also turn over to the Company, in good condition, all assets of the Company that are in your possession or control (or come into your possession or control in the future), including but, not limited to:*

*          *          *

- *all Confidential Information, whether maintained electronically or otherwise, including information on mobile or remote computers, such as desktop PCs, laptops, personal digital assistants, pagers, cell phones and all other wireless devices, whether you own the devices or the devices belong to the Company and are used at locations other than a JPMorgan Chase place of business.*

  *You are not permitted to duplicate or remove from JPMorgan Chase's premises, or directly or indirectly access, use or disclose to anyone, any Confidential Information.   (For a description and additional examples of Confidential Information, refer to section 7 of this Policy and section 1.4 – Dealing with Confidential Information in the Company's Code of Conduct)*

39.     In consideration for entering into an employment relationship with JPMorgan and entering into the agreements discussed above, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, underwriting, research, brokerage operations and health insurance.

### JPMorgan's Confidential Information

40.     During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan.  JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Defendant had no interaction with the substantial majority of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

41.     A critical factor to JPMorgan's continued success is its relations with its clients.  JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill.  JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

42.     JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its client information.  The substantial majority of the JPMorgan clients that Defendant serviced were developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

43.     JPMorgan also has expended significant resources to service its clients, the substantial majority of whom were assigned to Defendant or referred to him by JPMorgan Chase.  These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional

events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

44. JPMorgan employs reasonable efforts to maintain the confidentiality of its client records. Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records.

45. The trade secret information that Defendant, on information and belief, has misappropriated was entrusted to JPMorgan by its clients with the expectation that it would remain confidential and would not be disclosed to third parties. Indeed, by law JPMorgan must safeguard this information until such time as the controlling authorities authorize its release. Defendant had access to this information solely by virtue of his employment by JPMorgan. JPMorgan and Defendant are obliged to maintain the confidentiality of this information. For its part, JPMorgan took numerous steps to protect the confidentiality of this information. Defendant was fully aware of, and responsible for, complying with JPMorgan's internal policies regarding confidentiality. JPMorgan has implemented numerous other policies, and has established tight security, to ensure the confidentiality of its client information. For example, access to the JPMorgan's computer network by its professionals is password-protected. JPMorgan also limits its client information to certain employees and management who need access to such information.

46. Employees such as Defendant must maintain client information as strictly confidential. These instructions are confirmed in the various agreements and policy manual provisions referenced above.

### Defendant's Misconduct

47.     As noted above, Defendant abruptly resigned from JPMorgan on September 13, 2019 and immediately joined Raymond James. After joining Raymond James, Defendant has engaged in misconduct, including prohibited solicitation of JPMorgan clients.

48.     Since his resignation from JPMorgan and upon joining Raymond James, JPMorgan has learned that Defendant is engaging in aggressive solicitation of JPMorgan clients, and making disparaging remarks about JPMorgan to aid in his solicitation efforts.

49.     Since Defendant has resigned from JPMorgan and joined Raymond James, JPMorgan employees have spoken with many of the clients that Defendant was assigned to service during his JPMorgan employment, several of whom have informed JPMorgan that Defendant has contacted and solicited them since his departure from JPMorgan.

50.     Defendant is calling JPMorgan clients not only to announce his new employment, but is requesting meetings with such clients to discuss doing business with him at Raymond James.

51.     Specifically, JPMorgan has learned that Defendant is soliciting JPMorgan clients, primarily through phone calls and text messages to clients on their personal cell phones, in an effort to induce them to do business with him at Raymond James. At least three clients have informed JPMorgan that they received calls from Defendant in which Defendant asked to meet with them to discuss Raymond James or asked them to transfer their accounts to him at Raymond James. Moreover, one of those clients informed JPMorgan that he felt "pressured" by Defendant to meet with him and transfer his account to Defendant at Raymond James.

52.     In addition, to aid in his solicitation efforts, Defendant is disparaging JPMorgan to JPMorgan clients and is essentially using the same script to try to convince JPMorgan clients to meet with him, by telling clients that: (i) JPMorgan has inferior products to

that of Raymond James, and (ii) JPMorgan management limits the products that can be can to offered to clients. On information and belief, Defendant is making such false and disparaging statements in an effort induce the JPMorgan clients to transfer their accounts and assets from JPMorgan to him at Raymond James.

53.     In addition to improperly soliciting JPMorgan clients, on information and belief, Defendant improperly took with him to Raymond James JPMorgan's confidential client information, including contact information such as cell phone numbers, which, on information and belief, are generally not publicly available, and without which he would have been unable to immediately commence calling and soliciting JPMorgan clients upon his resignation.

54.     Defendant's misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients. To date, approximately 40 JPMorgan clients formerly serviced by Defendant have already moved their accounts from JPMorgan to Raymond James, with a total of more than $27 million in assets.

55.     Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, misappropriation of trade secrets, tortious interference, conversion, and unfair competition. Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct. This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients and employees.

56.     By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by

monetary damages. Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

(a) Loss of JPMorgan clients and loss of clients' confidence;

(b) Injury to JPMorgan's reputation and goodwill in Indiana;

(c) Use and disclosure of JPMorgan's trade secrets and confidential and proprietary information, including client lists;

(d) Loss of JPMorgan employees, damage to office morale and stability, and the undermining of office protocols and procedures; and

(e) Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

57.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 56 hereof.

58.     Defendant breached his contract and agreements with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking and using JPMorgan's confidential documents and information. By soliciting JPMorgan's clients and using and disclosing JPMorgan's proprietary and confidential information, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

59.     As a direct and proximate result of Defendant's breach of his contract, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

60. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 59 hereof.

61. JPMorgan's confidential and proprietary business and customer information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information. JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace. Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements. Accordingly, JPMorgan's confidential and proprietary business and customer information constitutes trade secrets pursuant to statutory and common law.

62. As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Breach of Fiduciary Duty)

63. JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 62 hereof.

64. As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and loyalty.

65. Defendant's fiduciary duty required him at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and customer information. Defendant's fiduciary duty required him at all times to refrain from, among other things, soliciting JPMorgan's clients to join him at a competing company.

66. Defendant breached his fiduciary duty to JPMorgan by engaging in the conduct alleged above. Defendant engaged in such wrongdoing prior to the time he resigned from JPMorgan and after he joined JPMorgan's competitor, Raymond James.

67. As a direct and proximate result of Defendant's breach of his fiduciary duty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**FOURTH CAUSE OF ACTION**
**(Breach of Duty of Loyalty)**

68. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 67 hereof.

69. By virtue of his position with JPMorgan, Defendant owed JPMorgan a duty of undivided loyalty during the term of his employment with JPMorgan. Defendant's duty of loyalty prohibited him from competing with JPMorgan or assisting a competing business during the course of his employment with JPMorgan. Defendant's duty of loyalty also included a duty to act toward JPMorgan fairly, honestly and in good faith, to maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and client information, and to refrain from any act or omission calculated or likely to injure JPMorgan.

70. Defendant breached his duty of loyalty to JPMorgan by engaging in the conduct alleged above (and incorporated herein) prior to the termination of his employment with JPMorgan.

71. Defendant knew and intended, or knew and recklessly or negligently disregarded, that his acts had the purpose and/or effect of disrupting and harming JPMorgan's business.

72. As a direct and proximate result of Defendant's breach of his duty of loyalty, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

### FIFTH CAUSE OF ACTION
**(Intentional Interference with Actual
and Prospective Economic Advantages)**

73. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 72 hereof.

74. JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

75. JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

76. JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously and improperly interfered with and continues to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or

indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to do business with his new employer.

77.     There was no privilege or justification for Defendant's conduct. Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including misappropriation of trade secrets, breach of contract, unfair competition, breach of his fiduciary duty, and breach of his duty of loyalty.

78.     Defendant's conduct was willful and malicious.

79.     As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION
### (Negligent Interference with Actual and Prospective Economic Advantages)

80.     JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 79 hereof.

81.     JPMorgan entrusted Defendant with confidential information for use solely in performing his duties as employees of JPMorgan. As an employee of JPMorgan, Defendant occupied a position of great trust and confidence. Defendant thereby owed JPMorgan a fiduciary duty to deal with JPMorgan in good faith and with loyalty. Defendant also was obligated to use due care so as not to interfere with JPMorgan's business relationships, including those with its clients.

82.     Defendant, in breach of his duty of due care, has attempted to induce JPMorgan clients to leave JPMorgan.

83. JPMorgan is informed and believes, and on that basis alleges, that Defendant was fully aware that his failure to use ordinary care could subject JPMorgan to lose clients.

84. As a direct and proximate result of Defendant's negligent interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

**SEVENTH CAUSE OF ACTION**
**(Conversion)**

85. JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 84 hereof.

86. At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

87. JPMorgan is informed and believes that Defendant took JPMorgan's trade secret and other proprietary information, including but not limited confidential client information, and converted such information for the use of Defendant and those acting in concert with him.

88. The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

89. As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## EIGHTH CAUSE OF ACTION
### (Unfair Competition)

90.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 89 hereof.

91.    Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

92.    As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendant as follows:

A.    In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award in the underlying dispute, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Raymond James, from:

> (a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose names became known to Defendant by virtue of his employment with JPMorgan (or any of its predecessors in interest); and

> (b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.     Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.     Such other and further relief as the Court deems just and proper.

Dated:  October 9, 2019

Respectfully submitted,

BLACKWELL, BURKE & RAMSEY, P.C.

/s/ Christopher C. Hagenow
CHRISTOPHER C. HAGENOW
Attorney No. 16730-49

BLACKWELL, BURKE & RAMSEY, P.C.
101 West Ohio Street, Suite 1700
Indianapolis, Indiana  46204
Telephone: (317) 635-5005
Facsimile: (317) 634-2501
Counsel for Plaintiff
J.P. Morgan Securities LLC