# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| J.P. MORGAN SECURITIES LLC, | ) |
| | ) CIVIL ACTION NO. 1:19-cv-4163-TWP-MPB |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ERIK W. WEISS, | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF SUSAN A. CHIPPS

SUSAN A. CHIPPS, under penalty of perjury, declares and says:

1. I am an adult, over 18 years of age, and am competent to provide this sworn Declaration. Except as to those matters stated on information and belief, I have personal knowledge of the facts below and would testify to them in Court if called upon to do so.

2. I am an Executive Director for plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"). I am a Market Director for JPMorgan's Chase Wealth Management division, and maintain an office in Fort Wayne, Indiana. I have been employed by JPMorgan and its predecessors-in-interest for approximately 15 years. I have been in my present position as a Market Director for Chase Wealth Management for approximately six years. I am the Market Director for the Northern Indiana Market, which includes approximately 35 branch offices, and have been for the past six years. I also am currently the Market Director for the Western Indiana Market, which includes approximately 33 branch offices, and have been for approximately three months. I submit this Declaration in support of JPMorgan's application for a Temporary Restraining Order and a Preliminary Injunction against defendant Erik W. Weiss ("Weiss" or "Defendant"). In preparation for this Declaration, I have reviewed Defendant's

employment files and other documents. Except as to those matters stated on information and belief, I have personal knowledge of the facts set forth below.

**Preliminary Statement**

3. This dispute arises out of Defendant's departure from JPMorgan on September 13, 2019, and the immediate commencement of his employment with Raymond James & Associates, Inc. ("Raymond James"). At the time of his resignation, Defendant was a Private Client Advisor in one of JPMorgan's branch offices in Indianapolis, Indiana, which is a branch I oversee as part of the Western Indiana Market.

4. Since Defendant's resignation from JPMorgan and upon joining his new firm, Raymond James, JPMorgan has learned that Defendant is engaging in aggressive solicitation of JPMorgan clients, and disparaging JPMorgan in the process.

5. Since Defendant has resigned from JPMorgan and joined Raymond James, JPMorgan employees have spoken with many of the clients that Defendant was assigned to service during his JPMorgan employment, several of whom have informed JPMorgan that Defendant has contacted and solicited them since his departure from JPMorgan. Such clients have confirmed that Defendant has contacted them not simply to announce his change in employment, but is actively soliciting their business on behalf of Raymond James.

6. Specifically, JPMorgan has learned that Defendant is soliciting JPMorgan clients, primarily through phone calls and text messages to clients on their personal cell phones, in an effort to induce them to do business with him at Raymond James. At least three clients have informed JPMorgan that they received calls from Defendant in which Defendant asked to meet with them to discuss Raymond James or asked them to transfer their accounts to him at

Raymond James. Moreover, one of those clients informed JPMorgan that he felt "pressured" by Defendant to meet with him and transfer his account to Defendant at Raymond James.

7. In one instance, a JPMorgan client informed the firm that after the client declined Defendant's request that they meet to discuss doing business, Defendant asked the client to call him and report back to him everything JPMorgan had to say. At least one other client reported a similar experience, in which Defendant requested that the client call him to update him on what JPMorgan is telling the client. On information and belief, Defendant intended to use this information in his continued solicitation of JPMorgan clients.

8. In addition, to aid in his solicitation efforts, Defendant is making disparaging comments about JPMorgan to JPMorgan clients. A JPMorgan client informed the firm that during Defendant's solicitation call to the client, Defendant said that JPMorgan has inferior products to that of Raymond James and that JPMorgan management limits the products that can be can to offered to clients. On information and belief, Defendant is making such false and disparaging statements in an effort induce the JPMorgan clients to transfer their accounts and assets from JPMorgan to him at Raymond James.

9. In addition to improperly soliciting JPMorgan clients, on information and belief, Defendant improperly took with him to Raymond James JPMorgan's confidential client information, including contact information such as cell phone numbers, which, on information and belief, are generally not publicly available, and without which he would have been unable to immediately commence calling and soliciting JPMorgan clients upon his resignation.

10. Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as approximately 40 JPMorgan clients formerly serviced by Weiss have

already transferred their accounts to him at Raymond James, with a total of more than $27 million in assets.

11. Based on my review of JPMorgan's records kept in the normal course of business, at the time he left JPMorgan, Weiss serviced approximately 600 JPMorgan clients/households, the substantial majority of which were either pre-existing JPMorgan clients at the time they were assigned to Weiss, or were developed by Weiss at JPMorgan. The clients whom JPMorgan had assigned to Weiss to service had a total of approximately $197 million in total assets under management. Weiss now seeks to improperly induce such JPMorgan clients to follow him to Raymond James.

12. Plaintiff JPMorgan is a member firm of the Financial Industry Regulatory Authority ("FINRA"). I am familiar with the facts and circumstances of Defendant's employment with, and resignations from, JPMorgan. To begin with, I am familiar with the client accounts that they were assigned to service. Additionally, I am familiar with the relevant documents, including Defendant's employment agreements, JPMorgan's Code of Conduct, as well as Defendant's employment records, registration and licensing forms, compliance records, and assorted other documents related to his employment with JPMorgan.

**Factual Allegations**

13. JPMorgan provides traditional banking, investment, and trust and estates services in the Indianapolis area through its Chase Wealth Management branch offices. Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach.

14. As the Market Director, I directly supervised Defendant at the time of his resignation.

15. Based on my review of JPMorgan records kept in the normal course of business, Weiss commenced employment with JPMorgan or its predecessors in or about January 2007, when he joined Chase Investment Services Corp. ("Chase Investment"), then a registered broker-dealer, and an affiliate of JPMorgan, and entered into a Chase Investment Services Corp. Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "2007 Non-Solicitation Agreement"), which contains provisions prohibiting him from soliciting the firm's clients for a one year period after the termination of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information. A true and accurate copy of the 2007 Non-Solicitation Agreement is annexed hereto as <u>Exhibit A</u>. Effective October 1, 2012, Chase Investment merged with and into JPMorgan, with JPMorgan being the surviving legal entity.

16. In 2013, Defendant was promoted to a Private Client Advisor and entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement with JPMorgan (the "2013 Non-Solicitation Agreement"). A true and accurate copy of the 2013 Non-Solicitation Agreement is annexed hereto as <u>Exhibit B</u>. The 2013 Non-Solicitation Agreement also contains provisions prohibiting Defendant from soliciting JPMorgan clients for a period of one year after the termination of his employment and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information.

17. At the time of his resignation, Weiss was a Private Client Advisor. JPMorgan Chase Bank, N.A. ("Chase Bank"), an affiliate of JPMorgan,[1] referred its bank clients to Defendant, in his capacity as a Private Client Advisor for Chase Wealth Management, in order

---

[1] For convenience, JPMorgan Chase Bank, N.A. and J.P. Morgan Securities LLC sometimes collectively are referred to herein as JPMorgan.

for him to build JPMorgan's relationship with such clients. Defendant sat at his desk at a Chase Bank branch and was introduced to hundreds of existing bank customers (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management. As a Private Client Advisor, Defendant was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan. The substantial majority of the clients Defendant serviced at JPMorgan were assigned or referred to him by JPMorgan.

18. As indicated above, JPMorgan gave Defendant the substantial majority of the clients he was servicing at the time of his resignation. Based on my review of JPMorgan records kept in the normal course of business, these clients assigned to Defendant were pre-existing JPMorgan clients who were reassigned to Defendant, were long-term Chase Bank clients who were referred to Defendant, or were developed by JPMorgan at the time they were assigned to Defendant.

19. Upon information and belief, JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years. It is with great difficultly, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients, and JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information. JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan. But for his employment with JPMorgan, Defendant would not have had any contact with the substantial majority of the clients the firm assigned or referred to him and whom he is now soliciting.

20. As part of his official duties at JPMorgan, Defendant had access to extensive confidential financial records and information about JPMorgan's clients, including information about each client's investment and trust and estates needs. As explained in further detail below, such information – which is not publicly available, and cannot be easily duplicated – is proprietary and valuable, and would be especially useful to a competitor such as Raymond James.

**Defendant's Employment Agreements and Obligations to JPMorgan**

21. As noted above, Defendant entered into multiple agreements with JPMorgan or its predecessors during his employment that contain non-solicitation and confidentiality provisions. See Exhibits A and B

22. On information and belief, although Defendant had some limited prior industry experience before joining JPMorgan or its predecessors, Defendant brought no clients with him to JPMorgan. In fact, the "Attachment A" to Defendant's 2013 Non-Solicitation Agreement is blank in the section for listing pre-existing relationships that he is bringing with him to JPMorgan, which is consistent with my understanding that Defendant brought no clients with him to JPMorgan.

23. Defendant also had access to and is bound by JPMorgan's Code of Conduct, which is made available to all employees on the JPMorgan intranet, as it was updated from time to time. The Code of Conduct has similar confidentiality provisions to those in Defendant's non-solicitation agreements with JPMorgan. A true and correct copy of relevant sections of JPMorgan's Code of Conduct, including Section 3.6, and the related policy link entitled "Responsibilities of Former Employees," is attached hereto as Exhibit C.

24. JPMorgan requires employees to annual affirm electronically their agreement to comply with the Code of Conduct. A true and correct copy of Defendant's affirmation to adhere to the Code of Conduct for the most recent acknowledgment cycle is annexed hereto as <u>Exhibit D</u>.

25. Defendant was provided with significant benefits related to his employment, including substantial compensation, office and support facilities, underwriting, research, brokerage operations and health insurance.

### JPMorgan's Confidential Information

26. During the course of his employment by JPMorgan, Defendant had access to highly confidential JPMorgan client information in addition to other financial and trust and estate information that is confidential and proprietary to JPMorgan. JPMorgan's client files contain confidential financial information, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data. Defendant had no interaction with the substantial majority of the clients he serviced at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan or its predecessors. As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

27. A critical factor to JPMorgan's continued success is its relations with its clients and advisors. JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill. JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and

support to its Chase Wealth Management employees, including Defendant, for them to use to obtain and build relationships with its clients.

28. JPMorgan's records concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients. JPMorgan has invested substantial corporate resources to develop and maintain its client information. The substantial majority of the JPMorgan clients that Defendant serviced was developed by JPMorgan at great expense and over a number of years. JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

29. JPMorgan has also expended significant resources to service its clients, the substantial majority of whom were assigned or referred to Defendant by JPMorgan. These resources include millions of dollars a year JPMorgan spends for sales support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services. JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Defendant.

30. JPMorgan employs reasonable efforts to maintain the confidentiality of its client records. Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are

constant reminders about the confidential nature of the information contained on the records. Employees such as Defendant must maintain client information as strictly confidential. These instructions are confirmed in the various agreements and policy manual provisions referenced above.

31. On September 13, 2019, the same day that Defendant resigned, JPMorgan sent a letter to Defendant's counsel to remind Defendant of his contractual obligations to JPMorgan, and included a copy of his 2013 Non-Solicitation Agreement. A true and correct copy of the September 13, 2019 letter (without attachments) is attached hereto as <u>Exhibit E</u>.

### **Defendant's Misconduct**

32. As noted above, Defendant abruptly resigned from JPMorgan on September 13, 2019 and immediately joined Raymond James. After joining Raymond James, Defendant has engaged in misconduct, including prohibited solicitation of JPMorgan clients.

33. Since his resignation from JPMorgan and upon joining Raymond James, JPMorgan has learned that Defendant is engaging in aggressive solicitation of JPMorgan clients, and making disparaging remarks about JPMorgan to aid in his solicitation efforts.

34. Since Defendant has resigned from JPMorgan and joined Raymond James, JPMorgan employees have spoken with many of the clients that Defendant was assigned to service during his JPMorgan employment, several of whom have informed JPMorgan that Defendant has contacted and solicited them since his departure from JPMorgan.

35. Defendant is calling JPMorgan clients not only to announce his new employment, but is requesting meetings with such clients to discuss doing business with him at Raymond James.

36. Specifically, JPMorgan has learned that Defendant is soliciting JPMorgan clients, primarily through phone calls and text messages to clients on their personal cell phones, in an effort to induce them to do business with him at Raymond James. At least three clients have informed JPMorgan that they received calls from Defendant in which Defendant asked to meet with them to discuss Raymond James or asked them to transfer their accounts to him at Raymond James. Moreover, one of those clients informed JPMorgan that he felt "pressured" by Defendant to meet with him and transfer his account to Defendant at Raymond James.

37. In addition, to aid in his solicitation efforts, Defendant is disparaging JPMorgan to JPMorgan clients and is essentially using the same script to try to convince JPMorgan clients to meet with him, by telling clients that: (i) JPMorgan has inferior products to that of Raymond James, and (ii) JPMorgan management limits the products that can be can to offered to clients. On information and belief, Defendant is making such false and disparaging statements in an effort induce the JPMorgan clients to transfer their accounts and assets from JPMorgan to him at Raymond James.

38. In addition to improperly soliciting JPMorgan clients, on information and belief, Defendant improperly took with him to Raymond James JPMorgan's confidential client information, including contact information such as cell phone numbers, which, on information and belief, are generally not publicly available, and without which he would have been unable to immediately commence calling and soliciting JPMorgan clients upon his resignation.

39. Defendant's misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients. To date, approximately 40 JPMorgan clients formerly serviced by Defendant have already moved

their accounts from JPMorgan to Raymond James, with a total of more than $27 million in assets.

40. Unless Defendant's misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

41. Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.

42. By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to inflict irreparable harm to JPMorgan by causing:

  (a) Loss of JPMorgan clients and loss of client confidence;

  (b) Injury to JPMorgan's reputation and goodwill in Indiana;

  (c) Loss of JPMorgan employees, damage to office morale and stability, and the undermining of office protocols and procedures; and

  (d) Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

**Pursuant to 28 U.S.C. Section 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on October 28, 2019.**

*/s/ Susan A. Chipps*
Susan A. Chipps